**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**



CARROLL SMITH, Individually and On Behalf of
All Others Similarly Situated,

           Plaintiff,

vs.

AON CORPORATION, PATRICK G. RYAN, AON
CORPORATION ADMINISTRATIVE
COMMITTEE, THOMAS STACHURA, JOHN A.
RESCHKE, NANCY GROSS, ROBERT S.
HURWITZ, ELIZABETH WHITTLE,

           Defendants.

No.

DOCKETED
OCT 2 7 2004

04C 6875

MAGISTRATE JUDGE SCHENKIER

---

## CLASS ACTION COMPLAINT FOR VIOLATIONS
## OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT

Plaintiff Carroll Smith, a participant in the Aon Savings Plan (the "Plan"), on behalf of himself and a class of all others similarly situated, allege as follows:

### INTRODUCTION

1.      This is a class action brought pursuant to § 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, against the Plan fiduciaries, including Aon Corporation ("Aon" or the "Company").

2.      401(k) plans confer tax benefits on participating employees to incentivize saving for retirement and/or other long-term goals. Employees participating in a 401(k) plan may have the option of purchasing the common stock of, or other investment options created by, their employer, often the sponsor of the plan, for part of their retirement investment portfolios. Company stock is an investment alternative in the Plan.

3.      Plaintiff Smith was an employee of Aon and a participant in the Plan during the Class Period. Plaintiff's retirement investment portfolio included Aon stock during the Class Period.

4.      Plaintiff alleges that Defendants, as fiduciaries of the Plan, breached their duties to the Plan, him and to the other participants and beneficiaries of the Plan in violation of ERISA, particularly with regard to the Plan's holdings of Aon common stock ("Aon Stock" or "Company Stock").

5.      During the Class Period, as described herein, Defendants knew or should have known that Aon stock was an imprudent investment alternative for the Plan due to the rampant business improprieties occurring at the Company. Upon information and belief, certain Defendants played an active role in overseeing, maintaining, hiding and/or implementing the illicit activities described herein in order to artificially inflate the value of Company stock during the Class Period.

6.      Defendants are liable under ERISA to restore losses sustained by the Plan as a result of their breaching of their fiduciary obligations.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

8.      Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan was administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and/or some Defendants reside or maintain their primary place of business in this district.

## PARTIES

*Plaintiff*

9.      Smith was a Aon employee, a participant in the Plan pursuant to § 3(7) of ERISA, 29 U.S.C. § 1102(7), and held Aon stock in his retirement investment portfolio during the Class Period.

*Defendants*

**Aon Corporation**

10.      Aon is a holding company whose operating subsidiaries carry on business in three distinct operating segments: (i) risk and insurance brokerage services; (ii) consulting; and (iii) insurance underwriting. Incorporated in 1979, AON is the parent corporation of both long-established and more recently formed companies.

11.      More specifically, the Risk and Insurance Brokerage Services segment consists principally of Aon's retail, reinsurance and wholesale brokerages, as well as related insurance services, including claims services, underwriting management, captive insurance company management services and premium financing. Aon's Consulting segment provides a full range of human capital management services utilizing five practices: employee benefits; compensation; management consulting; outsourcing; and communications. Aon's Insurance Underwriting segment is comprised of supplemental accident and health and life insurance and extended warranty and casualty insurance products and services.

12.      Aon is the Plan Sponsor. *See* Report on Form 11-K for the Aon Savings Plan, filed with the Securities and Exchange Commission on June 24, 2004 for the fiscal year ended December 31, 2003 ("2003 Form 11-K").

13. Aon is a fiduciary of the Plan within the meaning of ERISA. Aon exercises discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets. Aon at all times acted through its officers and employees, including its Chief Executive Officer ("CEO") and members of its Board oversight and/or Plan administrative committees appointed by the Company to perform Aon's Plan-related fiduciary functions in the course and scope of their employment.

14. Aon had, at all applicable times, effective control over the activities of its officers and employees, including over their Aon Plan-related activities. Aon, through its Board of Directors, Executive Officers or otherwise, had the authority and discretion to hire and terminate said officers and employees. Aon, through its Board and otherwise, also had the authority and discretion to appoint, monitor, and remove Directors, Officers and other employees from their individual fiduciary roles with respect to the Plans. By failing to properly discharge their fiduciary duties under ERISA, such Defendant-fiduciaries breached duties they owed to Participants in the Plans and their beneficiaries. Accordingly, the actions of these fiduciaries are imputed to Aon under the doctrine of *respondeat superior*, and Aon is liable for such actions.

***Director Defendants***

15. The Aon Board of Directors ("Board") directly authorized the formation of the Plan. *See* 2003 Form 11-K at 6. Upon information and belief, the Board, acting as a group, has ultimate fiduciary oversight over the Aon Corporation Administrative Committee ("Committee"), and is entrusted with the authority to appoint, remove, and monitor the activities of members of the Committee, as described below. The actions of the director-fiduciaries were on behalf of and attributable to the Company. As such, the Board of Directors is a fiduciary of the Plan within the

-4-

meaning of ERISA in that it exercises discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

16.     Patrick G. Ryan ("Ryan") served as Chairman of the Board, President, and Chief Executive Officer ("CEO") of Aon during the Class Period. As Aon's Board was the ultimate font of all fiduciary authority and responsibility for the Plan, Ryan, its Chairman, was clearly a fiduciary of the Plan within the meaning of ERISA during the Class Period in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets. Further, given his unquestioned "insider" status – indeed his ultimate executive authority and oversight responsibility – regarding Aon and its business operations, his knowledge of and likely complicity in the illicit activities detailed therein unquestionably impacted on his ability to fulfill his fiduciary responsibilities to the Plan.

17.     As more information will likely come to light, through discovery and otherwise, concerning other Board members' knowledge of and/or complicity in the revenue inflating schemes detailed herein, Plaintiffs reserve the right to amend this complaint to name additional Director Defendants as such information is uncovered.

***Committee Defendants***

18.     Aon Corporation Administrative Committee ("Committee") is the Plan Administrator and has discretionary authority to administer/operate the Plan and manage its assets. Therefore, the Committee is a fiduciary of the Plan in that it exercises discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

-5-

19.     Thomas Stachura ("Stachura") signed the Company's Form 11-K Plan annual reports to the SEC  for the Committee for each year from 2001-2003.  Upon information and belief, Defendant Stachura is a member of the Committee and a fiduciary of the Plan within the meaning of ERISA in that he exercises discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

20.     John A. Reschke ("Reschke") was Aon's Vice President of Compensation and Benefits during the Class Period and signed the Company's Form 11-K Plan annual reports to the SEC for the Committee for each year from 2001-2003.  Upon information and belief, Defendant Reschke is a member of the Committee and a fiduciary of the Plan within the meaning of ERISA in that he exercises discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

21.     Nancy Gross ("Gross") signed the Company's Form 11-K Plan annual reports to the SEC for the Committee for the year ended December 31, 2001, filed on June 27, 2002.  Upon information and belief, Defendant Gross was a member of the Committee during the Class Period and a fiduciary of the Plan within the meaning of ERISA in that she exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

22.     Robert S. Hurwitz ("Hurwitz") signed the Company's Form 11-K Plan annual reports to the SEC for the Committee for the year ended December 31, 2001, filed on June 27, 2002. Upon information and belief, Defendant Hurwitz was a member of the Committee during the Class Period and a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority

-6-

with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

23.     While additional individual members of the Administrative Committee are currently unknown to Plaintiffs, once their identities are ascertained, Plaintiffs will seek leave to join them under their true names.

***Unknown Fiduciaries***

24.     There are fiduciaries of the Plan whose identities are currently unknown to Plaintiff, including members of the various fiduciary committees.[1]  Once their identities are ascertained, Plaintiff will seek leave to join them under their true names.

25.     Defendants include named and *de facto* fiduciaries with respect to the Plan.  All Defendants exercised discretionary authority or control regarding management of the Plan, management of the Plan's assets, and/or administration of the Plan.

## THE PLAN

26.     The Aon Savings Plan is an "employee pension benefit plan," as defined by § 3(2)(A) of ERISA, 29 U.S.C. § 1002(2)(A).  The Plan is a legal entity which can sue or be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1).  However, in a breach of fiduciary duty action such as this, the Plan is neither a plaintiff nor a Defendant.  Rather, pursuant to ERISA § 409, 29 U.S.C. § 1109, and the law interpreting it, the relief requested in this action is for the benefit of the Plan.  Stated differently, in this action Plaintiff, who is described above, seeks relief on behalf of the Plan.

---

[1] *E.g.*, at least for part of the Class Period, the Trustees of the Employee Stock Ownership ("ESOP") portion of the Plan, or the portion invested in Company stock, were "members of the Company management." 2001 Form 11-K. These management trustees were specifically identified as "named fiduciaries [of the Plan] under ERISA." *Id.*

27.     The Plan is eligible to employees other than field sales agent or employees scheduled to work less than 20 hours per week. Eligible employees must complete one year of service to be eligible for Company matching contributions.

28.     In general, participants may elect to contribute between 1% and 16% of their compensation to the Plan. Contributions to the Plan may be invested in a number of investment alternatives offered by the Plan in any whole percentages. Among these investment alternatives is a fund consisting almost exclusively of Aon Stock.[2]

29.     Aon makes two forms of matching contributions. First, the Company makes matching contributions in an amount equal to 100% of the first 3% of the amount a participant contributes to the Plan. In addition, the Company makes a further matching contribution in Aon Stock, through the employee stock ownership plan ("ESOP") portion of the Plan,[3] equal to 75% of the next 3% of a participant's compensation that is contributed to the Plan.[4]

---

[2] "The assets of the [AON Stock Fund] are invested primarily in the common stock of the Company. Additionally, certain assets are invested by the [Plan] Trustees as deemed advisable in order for the Plan to meet its cash flow needs." 2003 Form 11-K.

[3] "In 2003, the [Company's] ESOP contribution was made in cash. In 2002, the ESOP contribution was made in shares of common stock of the Company." 2003 Form 11-K.

[4] Prior to January 1, 2003, the Aon Common Stock Fund (representing participant-directed investments in Aon stock) and the ESOP Allocated Fund (representing Company-directed investment in Aon stock) were presented as separate accounts because the assets of the ESOP portion of the Plan (which were comprised of the ESOP Allocated Fund investment in Aon common stock and receivables from the Company) were considered non-participant directed investments. Effective January 1, 2003, the Aon Common Stock Fund and the ESOP Allocated Fund were merged into a single fund called the "Aon Common Stock ESOP Fund." Also effective January 1, 2003, the fiduciary decision was made to allow participants to diversify out of Company matching contributions in the form of Aon Stock allocated to the Aon Common Stock ESOP Fund.

30.     Participants are immediately vested in their own contributions. "For the ESOP portion of the Plan, a participant vests in 20% increments per year and becomes 100% vested after completion of five years of plan service." 2003 Form 11-K.

31.     Throughout the Class Period, Aon common stock holdings represented the largest single investment of the Plan.  For example, as of December 31, 2003, Aon Stock represented *$302,540,000*, or *23%* of the total assets held by the Plan.

32.     As discussed below, the Aon stock held by the Plan was materially inflated at all times during the Class Period as a result of the Company's failure to disclose that a substantial portion of its revenue was based on (i) "contingent commissions," whereby the Company would be paid to steer business to those that paid said commission and away from those that chose not to engage in such business improprieties, and (ii) directed business to insurers willing to use its services when buying "reinsurance."

## DEFENDANTS' FIDUCIARY STATUS

33.     During the Class Period, upon information and belief, Defendants had discretionary authority with respect to the management of the Plan and/or the management or disposition of the Plan's assets.

34.     During the Class Period, the Defendants acted as fiduciaries of the Plan pursuant to § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A), and the law interpreting that section.

35.     Instead of delegating all fiduciary responsibility for the Plan to external service providers, Aon chose to internalize their respective fiduciary functions.

36.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under §

402(a)(1),[5] but also any other persons who act in fact as fiduciaries, *i.e.*, performed fiduciary

functions.  Section 3(21)(A)(i) of ERISA, 29 U.S.C. §1002(21)(A)(i), provides that a person is a

fiduciary "to the extent . . . he exercises any discretionary authority or discretionary control respecting

management of such plan or exercises any authority or control respecting management of disposition

of its assets . . . ."  During the Class Period, Defendants performed fiduciary functions under this

standard, and thereby also acted as fiduciaries under ERISA.

## CLASS ACTION ALLEGATIONS

37.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules

of Civil Procedure on behalf of himself and the following class of persons similarly situated (the

"Class"):

> All persons who were participants in or beneficiaries of the Plan at any
> time between October 31, 2002 and the present (the "Class Period")
> and whose accounts held Company stock.

38.     The members of the Class are so numerous that joinder of all members is

impracticable.  While the exact number of Class members is unknown to Plaintiff at this time, and

can only be ascertained through appropriate discovery, Plaintiff believes there are, at a minimum,

thousands of members of the Class who participated in, or were beneficiaries of, the Plan during the

Class Period.

39.     Common questions of law and fact exist as to all members of the Class and

predominate over any questions affecting solely individual members of the Class.  Among the

questions of law and fact common to the Class are:

---

[5] *See* n. 1, *supra.*

(a)     whether Defendants each owed a fiduciary duty to Plaintiff and members of the Class;

(b)     whether Defendants breached their fiduciary duties to Plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plan's participants and beneficiaries;

(c)     whether Defendants violated ERISA; and

(d)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

40.     Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff and the other members of the Class each sustained damages arising out of the Defendants' wrongful conduct in violation of federal law as complained of herein.

41.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action, complex, and ERISA litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

42.     Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

43.     Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (iii) questions of law

-11-

or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## DEFENDANTS' CONDUCT

**A.      Company Stock Was An Imprudent Investment For The Plan**

      **1.      Background Of Aon & The Insurance Industry In General**

44.      Aon's insurance brokerage segment represents the second-largest insurance broker in the United States, generating more than **$6.7 billion** in revenue world-wide. Together with the first largest broker in the U.S. – Marsh & McLennan Companies – these two companies control **70%** of the insurance brokerage market.

45.      The "insurance" market is comprised of three basic entities: (i) clients, (ii) brokers – those that obtain quotes and recommend coverage to the clients – and, (iii) the insurance companies themselves.

46.      As an insurance broker, Aon acts as a conduit between individual and business clients seeking insurance products and insurance carriers. Aon earns revenue through fees and/or commissions for services provided to clients in identifying, valuing, mitigating, transferring and administering their insurable risks.

47.      Consequently, a client seeking an insurance company often makes two payments. One to the broker for obtaining the coverage and one to the insurance company for providing the coverage. In smaller instances, the client generally writes one check to the broker who then forwards the insurance company's portion. Larger clients, however, such as commercial clients, sometimes pay both entities their fees directly.

-12-

48. In addition to the commission payment described above, brokers sometimes also received another form of payment, which came directly from the insurance companies. These payments, generally known as "contingent commission" agreements, are usually based on three factors: (i) the amount of business brokers place with an individual insurance company; (ii) the percentage of that business which renews its coverage policies with that insurance company; and (iii) the overall profitability of business placed with the broker.

49. The entire concept of contingent commissions, however, has raised a great deal of concern amongst the insurance industry. This is due to the inherent conflict of interest to a broker who has a duty to try to find/negotiate the best overall deal for its clients but is also incentivized to maximize its bottom line through collection of often lucrative contingent commissions paid by insurance companies. A study done by Advisen Ltd.[6] found that a majority of commercial insurance buyers believe that contingent commissions do constitute an inherent conflict of interest for insurance brokers.

50. Indeed, because of this conflict, the Risk Insurance Management Society, Inc. ("RIMS") has stated its position on contingent commissions as follows:

> RIMS believes that transparency is the only way to have a good professional relationship with brokers.

> \* \* \*

> In the relationship, the broker is to identify, at a client's request, the client's insurers with which the broker has a contingency or similar agreement. The client can then obtain a reasonable estimate of the contingency revenue generated by those agreements by applying the

---

[6] Advisen Ltd. is a provider of information, analytic and bench-marking tools for commercial insurance professionals, according to their website, advisen.com. They surveyed 330 organizations between May 13 - May 20, 2004 *via* e-mail and telephone.

latest average contingency factor to the respective premiums. If the estimate is substantial and the client requests additional information, the broker should calculate approximate contingency revenues by carrier and provide the client with the aggregate total of those calculations.

51.     For Aon's disclosure of these fees to be at all effective, it must be adequate and accurate and contain sufficient detail to show when a broker benefits from placing business with one insurance company over another insurance company. Disclosure of vague information in SEC filings is not adequate disclosure.

**2.     Defendants' Scheme**

52.     Throughout the Class Period, Aon engaged in two deceptive and coercive schemes, "steering" and "tying," in order to artificially inflate and manufacture its earnings.

53.     By "steering" more profitable business (those with low client claim-filing ratios) to insurance companies that paid Aon incentives, Aon was able to demand contingent commissions from insurance companies, ignoring its duties to its brokerage clients, and thereby obfuscating the Company's true financial performance. In laymen's terms, these contingent commissions simply served as kickbacks by insurers designed to entice brokers such as Aon to steer more business their way. These payments were styled as payments for "services," and became extremely lucrative for Aon. The payments were often the exclusive determining factor as to who the Company was steering business to and who it was steering business from.

54.     Thus, instead of providing unbiased brokering services by putting the interests of its customers first, Aon put its own interest first by maximizing the kickbacks it received from insurance companies and steering customers to purchase insurance from preferred clients regardless of whether the insurance provides the customer with the best coverage at the lowest price.

55.     Furthermore, in addition to steering, Aon also engaged in the anticompetitive practice known as "tying." Under this scheme, Aon would threaten to curtail sales for an insurance company unless the insurer also consented to allow Aon to provide the insurer with "reinsurance."[7] In this manner, the Company pressured insurers into letting Aon arrange additional coverage needs.

56.     The net effect of these schemes was to elevate the price of all insurance products, distort the Company's true financial and operational performance and correspondingly make the Company's stock an imprudent investment for retirement savings due to the dubious nature of the Company's financial reports and future earnings estimates, including the near-axiomatic negative reaction the market would have when this mammoth corporate scam came to light.

57.     These business improprieties were extremely profitable for the Company. Indeed, as the Company reported in its Form 10-K annual report, filed with the SEC on March 11, 2004 for the fiscal year ended December 31, 2003 ("2003 Form 10-K"), "The Risk and Insurance Brokerage Services segment generated approximately **58%** of our total operating segment revenues in 2003. This is the largest of our operating segments."

### 3.     Aon Failed To Disclose Pertinent Information To Plan Participants

58.     Throughout the Class Period, Aon failed to disclose, in both its press releases and SEC filings, that the contingent agreements and tying practices amounted to illicit kickbacks and materially inflated the Company's earnings and related financial information.

59.     For instance, on October 31, 2002, the Company issued a press release announcing its financial results for the third quarter of fiscal 2002, stating in relevant part:

---

[7] Reinsurance is essentially insurance coverage for insurance companies, which insurers purchase to reduce their risk. Reinsurance costs can often run into the tens of millions of dollars.

Third quarter 2002 reported earnings increased to $0.46 per share from $0.26 per share in third quarter 2001. Operating segment reported revenues for third quarter were up 17% year-over- year reflecting strong demand for Aon's services and products."

Commenting on these results, Defendant Ryan stated:

**Third quarter earnings showed excellent progress in Aon's brokerage segment with organic revenue growth of 18%, well above 10% in the second quarter.**

\* \* \*

Overall, we are encouraged by the progress we are making – especially our strong new business achievements across many of our businesses.

(Emphasis added)

60.    On November 4, 2003, Aon issued a press release announcing that its third quarter net income from continuing operations was $140 million or $0.44 per share, as compared with $121 million or $0.43 per share in 2002. Defendant Ryan, commenting on these results, stated "Our international brokerage and U.S. reinsurance businesses drove organic revenue growth in the quarter."

61.    These financial results were reaffirmed in the Company's Form 10-Q, filed with the SEC on November 13, 2003.

62.    On February 10, 2004, Aon reported financial results for the fourth quarter and twelve months ended December 31, 2003, with net income per share for the fourth quarter growing to $0.67 from $0.59 in 2002, and twelve months net income was $1.97 per share, up from $1.64 per share in 2002. The Company further reported that Risk and Insurance Brokerage Services fourth quarter revenue grew 11% to $1.5 billion, and organic revenue growth for the total segment was 7%, driven by the International and Americas retail and U.S. reinsurance brokerage businesses."

-16-

63. These financial results were reaffirmed in the Company's Form 10-K, filed with the SEC on March 11, 2004.

64. Throughout the Class Period Defendants repeated the pattern of misrepresenting the success of its business, while at the same time failing to disclose its scheme to artificially inflate the value of Aon Stock by engaging in improper steering and tying schemes.

**4. Aon's Scheme Unravels**

65. On or about September 2004, Aon, along with a number of the nations' largest insurance and brokerage companies, was served with subpoenas from the New York Attorney General in the course of a broad-ranging investigation into whether the Company had engaged in the illicit schemes discussed above.

66. On October 14, 2004, New York Attorney General Eliot Spitzer ("Spitzer") announced a suit had been filed against Marsh & McLennan Companies, the country's largest insurance broker (in front of Aon, which, as stated above, is the second largest) alleging that it steered unsuspecting clients to insurers with whom it had lucrative payoff agreements, and that the firm solicited rigged bids for insurance contracts. Spitzer stated unequivocally that "[t]here is simply no responsible argument for a system that rigs bids, stifles competition and cheats customers." The press release went on to state:

> The actions against the brokerage firm, Marsh & McLennan Companies, and the two executives stem from a widening investigation of fraud and anti-competitive practices in the insurance industry.
>
> * * *
>
> The civil complaint filed today in State Supreme Court in Manhattan alleges that for years Marsh & McLennan received special payments

-17-

from insurance companies that were above and beyond normal sales commissions. These payments -- known as "contingent commissions" -- were characterized as compensation for "market services" but were, in fact, rewards for the business that Marsh & McLennan and its independent brokers steered and allocated to the insurance companies. Industry representatives defend this long-standing practice as acceptable and even beneficial to clients, but **the Attorney General's office has uncovered extensive evidence showing that it distorts and corrupts the insurance marketplace and cheats insurance customers**. (Emphasis added).

67.     In addition to the suit against Marsh & McLennan, Spitzer announced that two American International Group Inc. ("AIG") executives had pleaded guilty to a first-degree felony count of a "scheme to defraud" because they allowed Marsh & McLennan to control the insurance market and "to protect incumbent insurance carriers when their business was up for renewal."

68.     However, these charges brought against Marsh & McLennan and AIG are the mere tip of the iceberg. As reported in an October 18, 2004 article in the *Wall Street Journal*:

Next on the hot seat: Aon Corp., the second-largest U.S. insurance broker, with more than $6.7 billion in brokerage revenue world-wide last year. Investigators are examining whether the Chicago-based firm improperly steered its customers based on fees from insurers and whether it engaged in bid-rigging.

69.     Indeed, in a October 21, 2004 article in the *Economist*, the New York attorney general's office reported that Aon is "being examined with particular interest." Further, the New York AG also stated, in the above-quoted *Wall Street Journal* article, that, although it is in the process of investigating the full extent of Aon's involvement in these illegal schemes, Aon is "dragging its feet as much as it can."[8]

---

[8]     Notably, the New York attorney general's investigation merely buttresses similar allegations involving illicit steering schemes propagated by Aon that have already been made in cases filed in California and Illinois earlier this year.

70.     Moreover, on October 25, 2004, the *New York Times* reported:

In six months of examining documents from insurance companies and brokers, investigators for the New York attorney general have discovered evidence at the Aon Corporation of deceptive and coercive practices, a person close to the inquiry said yesterday.

Until now, the sweeping investigation by Eliot Spitzer, the attorney general, has centered on Marsh & McLennan Companies, the world's largest broker, with headquarters in New York. In a civil lawsuit nearly two weeks ago, Mr. Spitzer accused Marsh of cheating customers by faking bids, fixing prices and steering business to the highest-paying insurance companies.

Investigators are pushing to complete their work on Aon, the world's second-largest broker, with headquarters in Chicago, **and could bring a civil lawsuit against the company within two weeks**, said another person who has been briefed on the case.

\* \* \*

The discovery of improprieties at Aon broadens Mr. Spitzer's investigation to a company that, along with Marsh, dominates the insurance brokerage business. Together, they control more than 70 percent of the market.

At Aon, the person close to the case said, **investigators have found documentation of brokers steering business to insurers that paid the company incentives. They also found another anticompetitive practice known as tying, a kind of pay-to-play arrangement in which brokers threaten to curtail sales for an insurance company unless the insurer lets the broker also arrange its own coverage needs or reinsurance.** Fees on reinsurance, which insurers buy to reduce their risk, can run into the tens of millions of dollars.

Both steering and tying can violate New York's fraud and antitrust laws and apply to anyone doing business in the state. Though Aon is based in Chicago, it has offices in New York, which is an important center for the insurance industry. Its founder, Patrick G. Ryan, announced late last month that he would be stepping down as chief executive after running the company for 40 years, but he gave no indication of when he planned to move on.

-19-

* * *

> Insurance executives and analysts have been anticipating that Aon
> would be the next target. Marsh arranges the insurance coverage for
> about 40 percent of corporate America, and Aon handles 30 percent.
> Between them, they have enormous purchasing power that enables
> them to compel insurance companies to meet their demands or risk
> losing business, industry experts said.
>
> "Anytime you have this much market power concentrated in the hands
> of such a small number of brokers, the pure competition that is
> supposed to occur in the free market is stifled," said Paul Equale, a
> Washington consultant. ("Emphasis added").

71.     In response to these alarming developments, between the announcement of the New

York Attorney General's charges on October 14, 2004 and the date of this filing, shares of Aon have

fallen approximately 30%. These dramatic, yet fully avoidable, losses eliminated at least millions of

dollars of Plan assets earmarked for participants' retirement savings.

72.     The fallout from Aon's illicit schemes is only just beginning. Aon, along with other

insurance and brokerage companies under investigation by numerous state attorneys general and

insurance regulators, are scrambling to take action and "spin" revelations of corporate misconduct

as limited in scope or materiality in order to avoid or minimize civil and criminal penalties.[9] Indeed,

on October 22, 2004, Aon announced that it would eliminate the practice of accepting or courting

contingent commissions by the end of 2004.

---

[9] *See* Insurance Probe Widens; Marsh Suspends Four, Boston Globe, October 21, 2004,
*available at* http://www.boston.com/business/articles/2004/10/21/insurance_probe_widens_
marsh_suspends_4/ (noting that "[i]n addition to New York and California, other states have
launched their own investigations" into the allegations outlined against Aon, Marsh and other
insurance brokers and providers outlined herein).

**B.     Defendants Knew Or Should Have Known That Aon Stock Was Not A Prudent Plan Investment**

73.     At all relevant times, Defendants, especially Defendant Ryan, knew or should have known that Aon was engaged in the questionable business practices detailed above which made Aon Stock an imprudent Plan investment.

74.     Defendants failed properly to take into account the numerous practices that put Aon Stock at risk as well as the fact that Aon Stock was inflated in value when determining the prudence of investing and holding Plan assets in Aon Stock.

75.     As a result of Defendants' knowledge of and, at times, likely implication in creating and maintaining the illicit schemes described above as well as public misconceptions concerning the true financial health of the Company, any generalized warnings of market and diversification risks that Aon made to Plan participants did not effectively inform Plan participants of the past, immediate, and future dangers of investing in Company Stock.

76.     In addition, Aon, and Defendant Ryan, as fiduciaries responsible for monitoring the investment of Plan assets, failed to adequately review the performance of the Committee to ensure that they were fulfilling their fiduciary duties under the Plan and ERISA.

77.     The Company, the Committee and other individual Plan fiduciary delegates failed to conduct an appropriate investigation into whether Aon Stock was a prudent investment for the Plan and, in connection therewith, failed to provide the Plan participants with information regarding Aon's improper activities so that participants could make informed decisions regarding Aon Stock in the Plan, or otherwise failed to protect the Plan and its participants against inevitable losses.

78.     Defendant Ryan's failure in this regard is particularly acute. As a result of his role as Aon's CEO and Board Chairman, Ryan inarguably knew or should have known of the Company's improper practices. Yet, upon information and belief, despite his obligation to properly and materially inform participants in the Plan of the true risks involved with holding Aon Stock, he remained silent.

79.     An adequate investigation by Defendants would have revealed to a reasonable fiduciary that investment by the Plan in Aon Stock offered by the Plan, under these circumstances, was imprudent. A prudent fiduciary acting under similar circumstances would have acted to protect participants against unnecessary losses, and would have made a different investment decision.

80.     Because Defendants knew or should have known that Company stock was not a prudent investment option for the Plan, they had an obligation to protect the Plan and its participants from unreasonable and entirely predictable losses incurred as a result of the Plan's investment in Company stock.

81.     Defendants had available to them several different options for satisfying this duty, including: making appropriate public disclosures as necessary; divesting the Plan of Company stock; consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the participants of the Plan; or resigning as fiduciaries of the Plan to the extent that as a result of their employment by the Company they could not loyally serve participants in the Plan in connection with the Plan's acquisition and holding of Company stock.

82.     Despite the availability of these and other options, Defendants failed to take any action to protect participants from losses as a result of Plan investment in Aon Stock.

**C.** **Defendants Regularly Communicated With Participants In The Plan Concerning Aon Stock Offered By The Plan, Yet Failed To Disclose The Imprudence Of Investment In Company Stock**

83.     Upon information and belief, the Company regularly communicated with employees, including participants in the Plan, about the performance, future financial and business prospects of the Company's common stock, the single largest single asset in the Plan. During the Class Period, the Company fostered a positive attitude toward the Company's stock, and/or allowed Participants in the Plan to follow their natural bias towards investment in the equities of their employer by not disclosing negative material information concerning investment in the Company's stock. As such, participants in the Plan could not appreciate the true risks presented by investments in the Company's stock and therefore could not make informed decisions regarding their investments in the Plan.

84.     As noted above, these SEC filings and related Company statements and releases were inaccurate, incomplete and materially misleading, causing Plan participants to purchase, and to hold and maintain, Plan investments in Aon Stock.

85.     The Company, Defendant Ryan, the Committee, and/or the Plan's individual fiduciary delegates failed to provide Plan participants with complete and accurate information regarding Aon Stock, such that the participants could appreciate the true risks presented by investments in Aon Stock and could make informed decisions regarding investments in the Plan.

**D.** **Defendants Suffered From Conflicts Of Interest**

86.     Aon's SEC filings, including Proxy Statements, during the Class Period make clear that a significant percentage of corporate officer compensation is in the form of stock grants or stock option grants. For example, for the 2003 fiscal year alone, Defendant Ryan was granted options to purchase 500,000 shares of Aon Stock.

-23-

87.     Because their compensation was so closely tied to the price of Aon Stock, Defendants

had a strong incentive to keep the Plan's assets in Aon's Stock, and to keep the Plan continually

investing, every month, in Aon Stock.  Elimination of the Company's stock as a Plan investment

option, on the other hand, would have reduced the demand for Aon Stock in the market and sent a

negative signal to Wall Street analysts, both of which would have adversely affected the price of Aon

Stock, resulting in lower compensation for the Defendants.

88.     Defendants may have had no choice in tying their compensation to Aon Stock (because

compensation was determined by Aon), but they did have the choice whether to keep the Plan

participants' and beneficiaries' retirement savings tied to Aon Stock.

89.     These conflicts of interest put the Defendants in the position of having to choose

between their own interests as executives and stockholders, and the interests of the Plan participants

and beneficiaries, in whose interests the Defendants were obligated to loyally serve with an "eye

single."

## CLAIMS FOR RELIEF UNDER ERISA

90.     At all relevant times, Defendants were and acted as fiduciaries within the meaning of

ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

91.     ERISA § 502, 29 U.S.C. §1132, provides, in pertinent part, that a civil action may be

brought by a participant for relief under ERISA § 409, 29 U.S.C. §1109.

92.     ERISA § 409(a), 29 U.S.C. §1109(a), "Liability for Breach of Fiduciary Duty,"

provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any

of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally

liable to make good to such plan any losses to the plan resulting from each such breach, and to restore

-24-

to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

93.     ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan *solely in the interest of the participants* and beneficiaries, for the *exclusive purpose of providing benefits to participants* and their beneficiaries, and *with the care, skill, prudence, and diligence* under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

94.     These fiduciary duties under ERISA § 404(a)(1)(A) and (B) are referred to as the *duties of loyalty, exclusive purpose and prudence* and are the "highest known to the law." They entail, among other things,

> a.     The duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan, including in this instance Company stock, to ensure that each investment is a suitable option for the plan; and
>
> b.     A duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

95.     ERISA § 405(a), 29 U.S.C. § 1105(a), "Liability for breach by co-fiduciary," provides,

in pertinent part, that:

> "...in addition to any liability which he may have under any other
> provision of this part, a fiduciary with respect to a plan shall be liable
> for a breach of fiduciary responsibility of another fiduciary with
> respect to the same plan in the following circumstances: (A) if he
> participates knowingly in, or knowingly undertakes to conceal, an act
> or omission of such other fiduciary, knowing such act or omission is
> a breach; (B) if, by his failure to comply with section 404(a)(1), 29
> U.S.C. §1104(a)(1), in the administration of his specific
> responsibilities which give rise to his status as a fiduciary, he has
> enabled such other fiduciary to commit a breach; or (C) if he has
> knowledge of a breach by such other fiduciary, unless he makes
> reasonable efforts under the circumstances to remedy the breach."

96.     Plaintiff therefore brings this action under the authority of ERISA § 502 for Plan-wide

relief pursuant to ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches

of fiduciary duties by the Defendants.

## CAUSATION

97.     The Plan suffered at least millions of dollars in losses because substantial assets of the

Plan were imprudently allowed to be put at great risk by Defendants, through investment by the Plan

in Aon Stock during the Class Period, in breach of Defendants' fiduciary duties.

98.     Defendants are responsible for losses caused by participant direction of investment in

Aon common stock because Defendants failed to take the necessary and required steps to ensure

effective and informed independent participant control over the investment decision-making process,

as required by ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated thereunder.

Defendants concealed material, non-public facts from participants, and provided misleading,

inaccurate, and incomplete information to them regarding the nature of the Defendants' illicit

-26-

activities and therefore the ongoing earnings levels of Aon, as well as the true underlying values of Aon Stock offered by the Plan, misrepresenting its soundness as investment vehicles. As a consequence, participants did not exercise independent control over their investments in Aon Stock and Defendants remain liable under ERISA for losses caused by such investment.

99.     Had the Defendants properly discharged their fiduciary and/or co-fiduciary duties, including the provision of full and accurate disclosure of material facts concerning investment in Aon common stock and divesting the Plan from Company stock offered by the Plan when maintaining such investment alternatives became imprudent, the Plan would have avoided a substantial portion of the losses that it suffered through its continued investment in Company common stock.

100.    Had the Defendants properly discharged their fiduciary and/or co-fiduciary duties, including the provision of full and accurate disclosure of material facts concerning investment in Aon common stock offered by the Plan, eliminating this investment alternative when it became imprudent and divesting the Plan from any then-existing investments in this investment alternatives when maintaining such investment became imprudent, the Plan would have avoided a substantial portion of the losses that it suffered through such continued tainted investment.

## COUNT I

### Failure to Prudently and Loyally Manage Plan Assets
### (Breaches of Fiduciary Duties in Violation of ERISA § 404)

101.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

102.    At all relevant times, as alleged above, the Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

103.    As alleged above, the Defendants were all responsible, in different ways and to differing extents, for the selection, maintenance and monitoring of the Plan's investments, including investment of Plan assets in Company Stock.

104.    Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to participants under a plan are prudent. Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested. The Defendants were responsible for ensuring that all investments in the Aon Stock Fund in the Plan were prudent, and are liable for losses incurred as a result of such investments being imprudent.

105.    Moreover, a fiduciary's duty of loyalty and prudence requires it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D). Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor allow others, including those whom they direct or who are directed by the plan to do so.

106.    The Defendants breached their duties to prudently and loyally manage the Plan's assets. During the Class Period these Defendants knew or should have known that Aon Stock was not a suitable and appropriate investment for the Plan as described herein for either (1) Aon Stock purchased through participant contributions to the Plan, or (2) Aon Stock accumulated by the Plan through Company matching contributions. Nonetheless, during the Class Period, these fiduciaries continued to offer the Aon Stock as an investment option for the Plan and to direct and approve Plan investment in Aon Stock, instead of in cash or other investments. Moreover, during the Class Period,

-28-

despite their knowledge of the imprudence of the investment, Defendant failed to take adequate steps to prevent the Plan, and indirectly the Plan participants and beneficiaries, from suffering losses as a result of the Plan's investment in Aon Stock.

107.    The fiduciary duty of loyalty also entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with single-minded devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

108.    The Defendants also breached their co-fiduciary obligations by, among other failures, knowingly participating in, making no effort to remedy, and/or knowingly undertaking to conceal, their fellow Defendants' failure to prudently and loyally manage Plan assets in the exercise of their discretion with respect to the offering Company Stock as an investment option in the Plan despite knowing that such failures were breaches of their ERISA-mandated fiduciary duties.

109.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investment.

110.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT II

**Failure to Monitor the Committee and to Provide It With Accurate
Information (Breaches of Fiduciary Duties in Violation of ERISA
§ 404 by Aon and Defendant Ryan)**

111.    Plaintiff incorporates the allegations contained in the previous paragraphs of this
Complaint as if fully set forth herein.

112.    At all relevant times, as alleged above, Aon and Defendant Ryan were fiduciaries
within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

113.    At all relevant times, as alleged above, the scope of the fiduciary responsibility of Aon
and Defendant Ryan included the responsibility to monitor other fiduciaries.

114.    The duty to monitor entails both giving information to and reviewing the actions of
the monitored fiduciaries (the Committee). In this case, that meant that the monitoring fiduciary, Aon
and Defendant Ryan, as the Chairman of Aon's Board, had the duty to:

> (1)    Ensure that the monitored fiduciaries possessed the needed credentials and
> experience, or use qualified advisors and service providers to fulfill their
> duties.  They must be knowledgeable about the operations of the Plan, the
> goals of the Plan, and the behavior of Plan participants;

> (2)    Ensure that the monitored fiduciaries had ready access to such outside,
> impartial advisors, counsel, and experts when needed;

> (3)    Ensure that the monitored fiduciaries were provided with adequate financial
> resources to do their job;

> (4)    Ensure that the monitored fiduciaries had adequate information and to do their
> job of overseeing the Plan investments;

(5)     Ensure that the monitored fiduciaries maintained adequate records of the information on which they base their decisions and analysis with respect to Plan investment options; and

(6)     Ensure that the monitored fiduciaries reported regularly to the Company.

115.     The Company, through its Board, including Defendant Ryan, must then review, understand, and approve the conduct of the hands-on fiduciaries.

116.     Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of plan assets, and must take prompt and effective action to protect the plan and participants when they are not. The duty to monitor encompasses a duty to periodically monitor the performance of the appointees so as to ensure compliance with their fiduciary duties under ERISA and the plan.

117.     The duty of prudence requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether investment fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a prudent process for obtaining the information and resources they need). In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to plan participants or for deciding whether to retain or remove them.

118.     Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets.

119.    Aon and Defendant Ryan breached their fiduciary monitoring duties by, among other things, (a) failing to ensure that the monitored fiduciaries had access to knowledge about the Company's business improprieties alleged above, which made Company Stock an imprudent retirement investment, and (b) failing to ensure that the monitored fiduciaries appreciated the huge risk inherent in the significant investment by rank and file employees in an undiversified employer stock fund. Aon and Defendant Ryan knew or should have known that the fiduciaries it was responsible for monitoring were imprudently allowing the Plan to continue offering the Aon Stock as a Plan investment, and continuing to invest in Aon Stock when it no longer was prudent to do so, yet failed to take action to protect the participants from the consequences of these fiduciaries' failures.

120.    In addition, as a result of its inappropriate and illicit activities and implicit knowledge thereof, Aon and Defendant Ryan, in connection with their monitoring and oversight duties, were required to disclose to the monitored fiduciaries accurate information about the financial condition and practices of Aon that it knew or should have known that these Defendants needed to make sufficiently informed decisions. By remaining silent and continuing to conceal such information from the other fiduciaries, these Defendants breached its monitoring duties under the Plan and ERISA.

121.    Aon and Defendant Ryan are liable as a co-fiduciaries because: (1) they knowingly participated in the fiduciary breaches by its fellow Defendant-fiduciaries in the activities implicated in this Count; (2) they enabled the breaches by these Defendants; and (3) they had knowledge of these breaches yet failed to make any effort to remedy them.

122.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investment.

-32-

123.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count is liable to restore the losses to the Plan caused by its breaches of fiduciary duties alleged in this Count.

## COUNT III

### Failure to Provide Complete and Accurate Information
### to Plan Participants and Beneficiaries
### (Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405 of ERISA)

124.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

125.    At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

126.    At all relevant times, the scope of the fiduciary responsibility of the Defendants included Plan communications and material disclosures.

127.    The duty of loyalty under ERISA requires fiduciaries to speak truthfully to participants, not to mislead them regarding the plan or plan assets, and to disclose information that participants need in order to exercise their rights and interests under the plan. This duty to inform participants includes an obligation to provide participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing false information or concealing material information, regarding Plan investment options such that participants can make informed decisions with regard to the prudence of investing in such options made available under the Plan. This duty applies to all Plan investment options, including investment in Aon Stock.

128.    Because investment in the Plan was not diversified (i.e. the Defendants chose to invest the Plan's assets, and/or allow those assets to be invested, so heavily in Aon Stock), such investment

carried with it an inherently high degree of risk. This inherent risk made the Defendants' duty to provide complete and accurate information particularly important with respect to Aon Stock.

129. The Defendants breached their duty to inform participants by failing to provide complete and accurate information regarding Aon Stock, Aon's business improprieties, public misrepresentations and inflated earnings, and the consequent artificial inflation of the value of Aon Stock and, generally, by conveying inaccurate information regarding the soundness of Aon Stock and the prudence of investing retirement contributions in Aon equity. These failures were particularly devastating to the Plan and the participants; a heavy percentage of the Plan's assets were invested in Aon Stock during the Class Period and, thus, losses in this investment had an enormous impact on the value of participants' retirement assets.

130. Defendants in this Count are also liable as co-fiduciaries because (1) they knowingly participated in and knowingly undertook to conceal the failure of the other fiduciaries to provide complete and accurate information regarding Aon Stock, despite knowing of their breaches; (2) they enabled such conduct as a result of their own failure to satisfy their fiduciary duties; and (3) they had knowledge of the other fiduciaries' failures to satisfy their duty to provide only complete and accurate information to participants, yet did not make any effort to remedy the breaches.

131. Where a breach of fiduciary duty consists of, or includes, misrepresentations and omissions material to a decision by a reasonable Plan participant that results in harm to the participant, the participant is presumed as a matter of law to have relied upon such misrepresentations and omissions to his or her detriment. Here, the above-described statements, acts and omissions of the Defendants in this Complaint constituted misrepresentations and omissions that were fundamentally deceptive concerning the prudence of investments in Aon Stock and were material to

-34-

any reasonable person's decision about whether or not to invest or maintain any part of their invested Plan assets in Aon Stock during the Class Period. Plaintiff and the other Class members are therefore presumed to have relied to their detriment on the misleading statements, acts, and omissions of the Defendants as described herein.

132.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investment.

133.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT IV

### Breach of Duty to Avoid Conflicts of Interest
### (Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405 of ERISA)

134.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

135.    At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

136.    ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on a plan fiduciary a duty of loyalty, that is, a duty to discharge his/her duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and its beneficiaries.

137.    Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*: failing to engage independent fiduciaries who could make independent judgments concerning the Plan's investment in the Aon Stock; failing to notify appropriate federal agencies, including the United States Department of Labor, of the facts and transactions which made Aon Stock an unsuitable investment for the Plan; failing to take such other steps as were necessary to ensure that participants' interests were loyally and prudently served; with respect to each of these above failures, doing so in order to prevent drawing attention to the Company's inappropriate practices; and by otherwise placing the interests of the Company above the interests of the participants with respect to the Plan's investment in Company Stock.

138.    As described above, certain Defendants, including Defendant Ryan, had compensation plans which were tied tightly to the value of Company stock.  Given the Plan's heavy ongoing investment in Aon Stock and the inevitable pressure on the Company and its  directors and top executives to meet earnings other revenue estimates, these Defendants were in an unacceptably conflicted position as fiduciaries of the Plan under ERISA, and were under an obligation to rectify the conflict in a reasonable manner by, for example, resigning their fiduciary duties and/or bringing in an independent, outside investment advisor.  The failure of any of these defendants to take any ameliorative action helped cause the Plan's significant investment losses in connection with its holdings of Aon Stock.

139.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's otherwise participants and beneficiaries, lost a significant portion of their retirement investment.

140.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in ths Count is liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

141.    The Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the Plan's assets should not have been so heavily invested in Company stock.

142.    As a consequence of the Defendants' breaches, the Plan suffered significant losses.

143.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan . . . ."  Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate . . . ."

144.    With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the plan would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available. In this way, the remedy restores the values of the plan's assets to what they would have been if the plan had been properly administered.

145.    Plaintiff and the Class are therefore entitled to relief from the Defendants in the form of: (1) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from

the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a)); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a)(2-3), 29 U.S.C. §§ 1109(a) and 1132(a)(2-3); (3) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (4) taxable costs and (5) interests on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

146.    Each Defendant is jointly liable for the acts of the other Defendants as a co-fiduciary.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for:

A.    A Declaration that the Defendants, and each of them, have breached their ERISA fiduciary duties to the Participants;

B.    An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

C.    Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

D.    An Order enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

E.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

F.      An Order that Defendants allocate the Plan's recoveries to the accounts of all participants who had any portion of their account balances invested in Company stock maintained by the Plan in proportion to the accounts' losses attributable to the decline in the price/value of Company stock;

G.      An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

H.      An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

I.      An Order for equitable restitution and other appropriate equitable monetary relief against the Defendants.

Dated: October 26, 2004

Carroll Smith, Individually and On Behalf of All Others Similarly Situated, Plaintiff,

By: _____

Marvin A. Miller
Jennifer W. Sprengel
Christopher B. Sanchez
**MILLER FAUCHER AND CAFFERTY LLP**
30 North LaSalle Street, Suite 3200
Chicago, Illinois 60602
(312) 782-4880

***Designated Local Counsel***

Richard S. Schiffrin
Joseph H. Meltzer
Edward W. Ciolko
Edward W. Chang
**SCHIFFRIN & BARROWAY, LLP**
Three Bala Plaza East, Suite 400
Bala Cynwyd, PA 19004
(610) 667-7706

***Plaintiff's Counsel***

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

**DOCKETED**

OCT 2 7 2004

# Civil Cover Sheet

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use <u>only</u> in the Northern District of Illinois.

**Plaintiff(s):** Carroll Smith,

County of Residence: Lincoln County

Plaintiff's Atty: Miller Faucher and Cafferty LLP
30 North LaSalle Street, Suite 3200
Chicago, Illinois 60602
(312) 782-4880

**Defendant(s):** Aon Corporation, et al.,

County of Residence:

Defendant's Atty:

JUDGE FILIP

04C 6875

MAGISTRATE JUDGE SCHENKIER

II. Basis of Jurisdiction: **3. Federal Question (U.S. not a party)**

III. Citizenship of Principal Parties **(Diversity Cases Only)**

Plaintiff:-**N/A**

Defendant:-**N/A**

IV. Origin : **1. Original Proceeding**

V. Nature of Suit: **791 E.R.I.S.A**

VI. Cause of Action: **29 U.S.C. § 1132**

VII. Requested in Complaint

Class Action:**Yes**

Dollar Demand:

Jury Demand:

VIII. This case **IS NOT** a refiling of a previously dismissed case.

Signature:

Date: 10/26/04

If any of this information is incorrect, please go back to the Civil Cover Sheet Input form using the *Back* button in your browser and change it.
Once correct, print this form, sign and date it and submit it with your new civil action. **Note: You may need to adjust the font size**

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

**DOCKETED**

OCT 2 7 2004

e Matter of

ROLL SMITH,

v.

Case Number: **04C 6875**

JUDGE FILIP

I CORPORATION, et al.

MAGISTRATE JUDGE SCHENKIER

EARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

roll Smith, individually and on behalf of all others similarly situated, Plaintiff

| (E) | | (F) | |
|---|---|---|---|
| URE *Edward W. Ciolko* | | SIGNATURE | |
| Edward W. Ciolko | | NAME Christopher B. Sanchez | |
| Same as (A) | | FIRM Same as (B) | |
| ADDRESS | | STREET ADDRESS | |
| ATE/ZIP | | CITY/STATE/ZIP | |
| HONE NUMBER | FAX NUMBER | TELEPHONE NUMBER | FAX NUMBER |
| ADDRESS | | E-MAIL ADDRESS csanchez@millerfaucher.com | |
| ICATION NUMBER (SEE ITEM 4 ON REVERSE) | | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 06272989 | |
| ER OF TRIAL BAR? | YES ☐ NO ☑ | MEMBER OF TRIAL BAR? | YES ☐ NO ☐ |
| ATTORNEY? | YES ☐ NO ☑ | TRIAL ATTORNEY? | YES ☐ NO ☐ |
| | | DESIGNATED AS LOCAL COUNSEL? | YES ☐ NO ☐ |

| (G) | | (H) | |
|---|---|---|---|
| TURE *Edward W. Chang* | | SIGNATURE | |
| Edward W. Chang | | NAME | |
| Same as (A) | | FIRM | |
| ET ADDRESS | | STREET ADDRESS | |
| ATE/ZIP | | CITY/STATE/ZIP | |
| HONE NUMBER | FAX NUMBER | TELEPHONE NUMBER | FAX NUMBER |
| L ADDRESS | | E-MAIL ADDRESS | |
| IFICATION NUMBER (SEE ITEM 4 ON REVERSE) | | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | |
| ER OF TRIAL BAR? | YES ☐ NO ☑ | MEMBER OF TRIAL BAR? | YES ☐ NO ☐ |
| ATTORNEY? | YES ☐ NO ☑ | TRIAL ATTORNEY? | YES ☐ NO ☐ |
| NATED AS LOCAL COUNSEL? | YES ☐ NO ☑ | DESIGNATED AS LOCAL COUNSEL? | YES ☐ NO ☐ |

U.S. DISTRICT COURT CLERK 04 OCT 26 PM 3: FILED FOR DOCKETING

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

e Matter of

**ROLL SMITH,**

v.

**CORPORATION, et al.,**



DOCKETED
OCT 2 7 2004

JUDGE FILIP

Case Number: **04C 6875**

MAGISTRATE JUDGE SCHENKIER

EARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

oll Smith, individually and on behalf of all others similarly situated, Plaintiff

| (A) | (B) | |
|---|---|---|
| SIGNATURE *Richard S. Schiffrin* | SIGNATURE | |
| NAME Richard S. Schiffrin | NAME Marvin A. Miller | |
| FIRM Schiffrin & Barroway, LLP | FIRM Miller Faucher and Cafferty LLP | |
| STREET ADDRESS Three Bala Plaza East, Suite 400 | STREET ADDRESS 30 North LaSalle Street, Suite 3200 | |
| CITY/STATE/ZIP Bala Cynwyd, Pennsylvania 19004 | CITY/STATE/ZIP Chicago, Illinois 60602 | |
| PHONE NUMBER (610) 667-7706 / FAX NUMBER | TELEPHONE NUMBER (312) 782-4880 | FAX NUMBER 782-4485 |
| ADDRESS | E-MAIL ADDRESS mmiller@millerfaucher.com | |
| IFICATION NUMBER (SEE ITEM 4 ON REVERSE) | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 01916769 | |
| ER OF TRIAL BAR? YES ☐ NO ☐ | MEMBER OF TRIAL BAR? YES X NO ☐ | |
| ATTORNEY? YES ☐ NO ☐ | TRIAL ATTORNEY? YES X NO ☐ | |
| | DESIGNATED AS LOCAL COUNSEL? YES X NO ☐ | |

| (C) | (D) | |
|---|---|---|
| SIGNATURE *Joseph H. Meltzer* | SIGNATURE *Jennifer W. Sprengel* | |
| NAME Joseph H. Meltzer | NAME Jennifer W. Sprengel | |
| FIRM Same as (A) | FIRM Same as (B) | |
| STREET ADDRESS | STREET ADDRESS | |
| STATE/ZIP | CITY/STATE/ZIP | |
| PHONE NUMBER | FAX NUMBER | TELEPHONE NUMBER | FAX NUMBER |
| L ADDRESS | E-MAIL ADDRESS jsprengel@millerfaucher.com | |
| IFICATION NUMBER (SEE ITEM 4 ON REVERSE) | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 06204446 | |
| BER OF TRIAL BAR? YES ☐ NO ☑ | MEMBER OF TRIAL BAR? YES ☐ NO ☑ | |
| ATTORNEY? YES ☑ NO ☐ | TRIAL ATTORNEY? YES ☑ NO ☐ | |
| GNATED AS LOCAL COUNSEL? YES ☐ NO ☑ | DESIGNATED AS LOCAL COUNSEL? YES ☑ NO ☐ | |